ON the trial of this case a question was made as to ‘the admissibility of Mr. Benjamin Harvey as a in this cause; and his testimony was taken subject to the opinion of the Court upon his competency.
The objection is, that as Mr. Harvey had accepted bill of sale of some of the negroes in question, which is expressed to be for valuable consideration ; and as he afterwards conveyed the negroes to Mr. Hibben in trust, for the children of Mr. Townsend, he ought not to be permitted to give evidence to invalidate those deeds.
This rule of evidence, relied upon, as laid down in the famous case of Walton and Shelly, reported in 1 Burn, and East, p. 300, is, “ that no party who has ever signed a paper or deed shall ever be permitted to give testimony to invalidate it.5’
This rule, however, was itself a departure from the plain and simple doctrine of evidence, which excluded none from giving testimony, but those who were interested, or infamous, or incapable from infancy, idiocy or insanity, and admitting all others, left the credibility of their testimony to be judged of by those marks which distinguish truth from falsehood. -
The rule as laid down in Walton and Shelly has been found inconvenient in practice-. It has been found to ; , . , . . shut up the avenues to truth in many cases, wuere- ac *224 complices, or persons unwarily drawn in to partake in some illegal or fraudulent transaction, were willing to> redeem their error and to disclose the truth. It has therefore been the endeavor of the judges to break down the new rule and to return to the old law.
In Bent and Baker, 3 D. & E. 35, Lord Kenyon confined the rule to negotiable paper ; and afterwards, in. Jordaine vs. Lashbrooke, 7 D. & E. 601, Lord Kenyon denied the rule altogether.
In the United States, the rule in Walton and Shelly lias been recognized in several of the state courts and doubted in others ; but the better opinion seems to be established, that the rule, if admitted, must be confined to negotiable paper. Chief Justice Tilghman, of Pennsylvania, in the case of Baring, assignee of J. B. Cutting, vs. Shippen, stated that the rule was confined to negotiable instruments, by a decision of the Supreme Court of Pennsylvania in Pleasant vs. Pemberton, 2 Dallas, 196, which he considered as having settled the law.
In this collision of opinions among such eminent judges, we are left free to resort to principles j and upon the best view, which I have been able to take of the subject, I am of opinion, that if the rule in Walton and Shelly be admitted at all, its operation should be confined to negotiable instruments. The truth is, that if Harvey was interested at all, it would be to support the deeds and not to destroy them. But in reality he has no interest, he comes to disavow all interest.
As the deeds in question are not of the negotiable character, I consider Mr. Harvey a competent witness and his evidence admissible. The objection was not taken to the competency of Mr. Hibben, though if it had been good against Mr. Harvey it would have applied in part to him.*
*225 Saving cleai’ed the way of this objection, let ns look at the general features of the case, explained by the tea-timony given by these gentlemen i as well as by the other evidence given iii the cause¿
Stephen Townsend made an absolute conveyance, on the 14th September, 1785, of his land of 100 acres, in Christ Church, to Mrs. Arthur, a widow lady* expressing to be for the valuable consideration of 250k — ¡and afterwards executed two bills of sale to her, dated the 14th October and 1st December, 1785, of 17 negroes, also for valuable consideration, amounting to 1320k Some time afterwards, to wit, on the 28th December, 1785, he executed a marriage settlement, by which, after reciting that a marriage was intended to take effect *226 between himself and Mrs. Arthur, and that she was eh». titled to certain negroes and other personal property tinder the will of her first husband ; also, to a tract of land 100 acres’ in her own right, and to certain other nes-groes and personal property acquired by her since the C)£ }ier fu,s^ husband, he then proceeds to stipulate and agree, that the said property should be and remain in the hands of trustees therein named, for the uses and .purposes therein -expressed, to wit, for the use of the husband and wife, and afterwards, of the children of the intended marriage. The marriage took effect, and there was issue of it. After some years, Mr* Townsend conveyed by hill of sale, dated the 7-th February, 1792, -thirteen of his negroes to Miv HarVey, expressing it to be for the valuable consideration of 650k Mr. Harvey, -oh the 27th March, 1792, conveys six of these negroes to Mr. Hibben, in trust for the use of the t\v6 taiisor sons of Stephen Townsend. On the 22d February, 1792, Mr. Townsend executed a bill of sale for seven negroes, -to Clement Brown, executor of George Arthur, in consideration of 210k On the 31st December, 1791/ Townsend executed a bond to Clement Brown, conditioned to pay 200k on or before the 1st January, 1792, which was put in suit on the 3d January, 1792, and .judgment confessed, and execution issued immediately ; whereupon a levy was made oh a tract of land of 100. acres in Christ Church, and the same was sold, and-purchased by J. Hibben, Esq. and conveyed to him by the sheriff for the sum of 152k 5s. on the 7th'Oct. 1792.
Oh the 7th March, 1792, Moses Whitesides, in consideration of 5k and the uses and trusts of the deed, conveys 60 acres of land in Christ Church to Mr. J. Hibben, in trust for the use of the two minor soné of Stephen Townsend, ,
These seem to he the principal circumstances of the rase, as they appear by the deeds and other papers produced. But tq a right understanding of the truth of the case, wo must examine much deeper, and we shall find *227 I.Jtem very fully explained by the testimony given in the cause*
It appears then that Mr. Townsend was a man of mo■derate property, and owing a good deal of money. Many .of his debts were incurred in 1784 and 1785, as appears by the judgments subsequently obtained on them. The sheriff had levied on his negroes, and he began to he apprehensive of the loss of them. After this he conveys 17 of his negroes and his tract of 100 acres of land to Mrs. Arthur, in fee simple, and for a pretended valuable consideration. No proof, however, is given, that it was for a valuable consideration. Mrs. Arthur had a very small property under the will of her first hush and», and could not make these purchases ,• and to crown alR Townsend remained in possession of all the property, so-pretended to have been sold 5 and none of the-deeds are-recorded. Indeed the idea of a sale was- given up on-the argument, and the counsel for the defendant rested» upon this ground — that these conveyances were made in contemplation of an intended marriage with Sirs. Arthur, which was perfected by a subsequent marriage, settlement, and consummation of the marriage.
This whs, however, a most extraordinary procedure,, to convey absolutely the greater- part of his property to-a lady, in contemplation of marriage, and- yet to make, no statement or reference to such am event, but te put it wholly on the ground- of a valuable consideration, which is acknowledged to be false,* without making the smallest provision to vacate.the deeds in case the marriage should not take effect,
The marriage articles treat the property as belonging to Mrs. Arthur y they refer to her property under her first husband’s-will, and to her acquisitions of land and1 negroes since his death, and agree that her property so described should stand .and enure to the trustee for the use of the family. But her possessions under her first .husband’s will were very trifling,* only the negro woman JBetty and her future issue — a chair and two horses were given absolutely, and a fourth part of his move- *228 a^es’ ^or life» with liberty to reside on the plantation, during widowhood. The newly acquired property seems to be no other than the land and negroes conveyed by Townsend to her a little time before.
With so many circumstances appearing in this case ^ s}iew a deliberate intention on the part of Mr. Townsend to cover his property from his creditors, I cannot look with a favorable eye on these transactions, and go so far as the ingenious counsel did, to connect the marriage settlement with the preceding deeds of absolute conveyance, and thereby to give life and validity to these deeds, which were fraudulent and void. The bill of sale made by Mr. Townsend to Mr. Harvey of thirteen negroes, part of which he afterwards conveyed to Mr. Hibbeii, in trust for Townsend’s children, express-' es to be for valuable consideration: yet Mr. Harvey swears that he never paid a cent for them, and that he never had the negroes in possession ; they remained always with Townsend, and the deed was never recorded. Mr, Hibben swears he never had the negroes in his possession — .they remained with Townsend; and both swear that they are satisfied a]l these measures were taken to cover the property from Townsend’s creditors. Indeed he acknowledged to Mr. Harvey that this was his object; in the several deeds.
With respect .to the bond given by Townsend to Clem, Brown, executor of George Arthur, on the 31st January, 1791, and judgment immediately confessed on it, there are strong marks of a design to cover the property from his creditors, who were then suing him, and several of whom got judgments in March, 1792, a few days after the judgment was entered up for Clement Brown. , Some .of them in August and October, 1792, and some afterwards.
It is evident that the precipitation in this case was to anticipate and elude these judgments. Mr. Wiiistanly said he thought the bond was anti-dated. It is indeed alleged, that the bond to Brown, executor of Arthur, Was for a bona fide debt due by Townsend to the execur *229 tor, for the hire of the negroes of the estate of Arthur. This however is-very doubtful. How is it that Brown never got any settlement or acknowledgement of debt, or took any steps prior to the moment that the creditors were threatening Townsend ? How is it that no statement how the debits and credits stood, and on which the . settlement was made, is even yet exhibited ? And we find that several respectable men, who afterwards examined the accounts as arbitrators, were of opinion that nothing was due by Townsend to Arthur’s estate, for that his charges for board, clothing and educating the children of Arthur, were equivalent to the demands of the estate of Arthur against him for the hire of the ne-groes. And finally, Clement Brown, by a letter of the 9th Nov. 1792, to his attorney, declares that Stephen Townsend had satisfied him on account of the judgment, and that he had nothing to do with the money arising from the sale of the land under that judgment.
With respect to the bill of sale of seven negross, made by Townsend to Clement Brown, executor of Arthur, of the 22d February, 1792, it is subject to all the objections made to the other bills of sale — it is not recorded } no proof of valuable consideration was shewn; no grounds to suppose a bona fide debt due by Townsend to Arthur’s estate; no possession went with the bill of sale : and it immediately preceded the judgments then about to be obtained.
It was insisted, that the possession not going with the deeds, is not of itself a fraud, but a mere badge of fraud; and that possession might sometimes remain with the vendor, and be consistent with the deed. There has been some diversity on this point; but the later causes have rather gone to establish the point, that possession not going with the deed is of itself a fraud, and vitiates the deed, unless the vendors remaining in possession of the property be consistent with the provisions of the deed. But it is unnecessary, in this case, to examine this point minutely. It is admitted to be a badge of fraud on all hands : and that badge remains imrnove- *230 abIy ®xe<^ «pon these transactions. No explanations^ 110 circumstances, have been shewn to remove it. In the case of Bardeleben vs. B. & S. Beckman, (decided *n Court in June, 1793,) the possession not going with the deed and the deed not being recorded, the deed wag decree¿ ¿0 be void as to the creditors, though the transaction was acknowledged to be fair.
Under all these circumstances it is impossible to doubt. We may pity the infirmity of the human mind, sinking under an approaching pressure of distress, and resorting to such means of protection and provision for a family j but we cannot approve, and the law will not sanction these measures — it pronounces them void.
"frith respect to the one hundred acres of land, seized and sold under the execution of Clem. Brown, which were purchased in by Mr. Hibben, to whom titles were made ; it is equally obvious that the sale was effected to shelter the land from the effects of the judgments of the creditors. The titles to Mr. Hibben are dated the 7th of October, 1792; yet on the 9th of November, 1792, Clement Brown writes to his attorney that he is not entitled to the amount of the purchase money, for that. Townsend had sometime before satisfied him for the debt and judgment, under which the sale had been made.
Again, Mr. Hibben swears that he bought in the land at the desire of Townsend, and for the benefit of his far mily. And that Townsend furnished the amount of the purchase money which ho paid, through a negro boy. With respect to the 60 acres of land convoyed by Moses Whitesides for Si. to Mr. Hibben in trust for the use of the two minor children of Stephen Townsend, there is hot much testimony explanatory of that. But I fear it partakes of the nature of all the rest of the transactions of this case. The deed is not recorded. Mr. Hibben says the conveyance was made to him without his privity or consent. He paid nothing for it. It was part of the land bought by Townsend from Harvey, and Townsend always remained in possession of that as well as, the negroes. Now what was the consideration moving *231 from 'Whitesides to Townsend to', induce him to convey this land to Whitesides, which must have beep .done before he conveyed to Hibben ? .JÍQhO-vhas been shewm Whitesides conveys, a few days before judgments are entered up against Townsend, this land for 5l. to Hib-ben, in trust for Townsend’s children.
It was insisted that a man may purchase lands and take the conveyances to his children ; that the statutes were made to prevent fraudulent sales ; but that it wag a new pretence, to say that there could be fraudulent purchases. And some authorities were cited to support this doctrine.
Undoubtedly a man may do so j and if it be done bona, .fide, whilst he is in good circumstances, not overwhelmed with, debt, and without any of those indications, that it was a mere cover for property against creditors, the Court would protect such purchases. But under the circumstances disclosed in this case, this conveyance partakes of the character of all the other transactions— it docs not appear to have been bona fide, but to have •been intended merely as a shelter to the property. ■ And ■the witnesses attest the declarations of Townsend, that if he recovered a large debt due to him, and could pay Ids debts, he would destroy all these deeds. It is of importance to remember in this case, that after all these transactions, nothing, or but little, was left of Townsend’s property for the creditors. The administrator Harvey can find nothing wherewith to pay them.
We should now have arrived at the conclusion of our painful enquiry, if other questions had not been made by the ingenuity of counsel. It is alleged that the marriage .settlement made in this case was bona fide, and is entitled to the highest consideration in this Court; and that the property being in part, if not wholly, the wife’s, the existence of debts did not interfere with it — and also, that though not recorded, it is valid and effectual to protect the property comprised in it; as it was one of those cases which did not come within the provisions of the acts requiring a record within a limited time.
*232 ^ "IS vcl’y true, as the counsel for the defendant urg-eth that though a man be indebted, he is at liberty to niake a marriage settlement; inore especially of his inten(te^ wife’s property. Yet this position, like most others, must be taken with reasonable restrictions. As to the intended wife’s property there can be no doubt: and generally speaking, a man possessed of property, and owing some debts, which however have not yet obtained any lien, may make a reasonable settlement on his intended wife. And if adverse accidents occur, and diminish his property, the settled part of it will be protected for the benefit of the family. But all this proceeds upon the ground of a bona fide transaction. Now1 can it bo said, if a man of small property, and considerable debts, conveys the bulk of his own property in a marriage settlement, so as to elude the just demands of his creditors, that ho acts bona fide? I think not. This is precisely the case here. The deed of settlement in this case professes to comprise all the property which Mrs. Arthur, the intended wife, held under her first husband’s will, and all the property she had acquired since his death. What she held under her first husband’s will was, as we have seen, very trifling. What she acquired appears to have been the tract of land and negroes, conveyed to her for a nominal valuable consideration some time before by Townsend. But it has been conceded that there was no consideration, these deeds being alleged to be made in contemplation of marriage. But I cannot View these conveyances in that light, or connect them with the subsequent marriage, to which they bear no relation, and have no connexion oii their face.
Considering them as voluntary conveyances, made by a man much indebted, and the deeds not recorded, and no possession going with them, I must declare them null and void; consequently, the greater part of the property in the settlement, nay, almost the whole, was Townsend’s property.
In my opinion, the settlement of so large a proportion of a man’s estate, under Townsend’s circumstances. *233 'would have been very questionable, even if the deed had been recorded.
The deed is executed on the 28th December, 1785, by Stephen Townsend alone $ no subscribing witnesses sign it on the day of its date* On the 30th December, 1785, Richard llowser and Addon Froggat endorse a memorandum, that peaceable and quiet possession and seizin of the real and personal property, contained in the deed, was given, by a key being delivered to the trustee, in the name of the whole» in their presence. And on the 17th November, 1789, Adden Froggat attests the execution of the deed, but without stating at what time. The deed has never been recorded, and it is’’contended, by the defendant, that it was not necessary to do so. That the case of Lenox and wife vs. William H. Gibbes, decided that the act of 1785 was obscure and inoperative $ and that the penal clause, declaring the settlement void for want of recording, did not attach to the enacting clause. That the act of 1792 amends only the first clause of the act of 1785 ,* which first clause speaks only of marriage settlements made anterior to the act of 1785, and not to those which might be made after the act of 1785. That the settlement of Townsend being executed in December, 1785, was subsequent to the first act and prior to the second act. That settlements made between the two acts, formed a casus omissus not provided for, and consequently they were good without recording. The candor of the counsel conceded that the decision made by the Court, in Wilson and Wilson, was different from that of Lenox and Lenox. Let us examine these acts, and these cases, accurately.
The first act was passed on the 8th March» 1785. The second act on the 21st December, 1793. The settlement made by Townsend bears date the 28th December, 1785. The case of Lenox was decided, in September, 1792. The case of Wilson in September, 1794.
The act of March, 1785, directs — 1st. That every marriage contract, deed, or settlement, then in existence, should be proved and recorded in lbc secretary’s *234 office within' a limited time. Persons out of the staté have'twelve months.
2d. That all marriage contracts, &c. entered into af-^cr ^10 l)assinS the act, shall, within 3 months after the execution, be in like manner proved and recorded.
sd. That whosoever, interested in such marriage deed, contract or settlement, shall neglect or refuse to record the same in the manner, and within the times be-forementioned, and in the office aforesaid, then the same in respect to creditors shall be deemed fraudulent; and the estate intended to he secured shall be liable to the ■payment of the debts diie by such persons, as if no such, deed, contract, or settlement, had been made.
The trial of the case of Lenox and wife vs. Wm. H. Gibbes took place in Sept. 1792. That was the case of in marriage settlement executed prior to the act of 1785, and not recorded. The Court was of opinion that the act of 1785 was not clearly drawn: that the word such,” in the 3d clause, must be considered as a relative, and by the rules of grammatical construction confined to the immediate preceding clause, as its antecedent ; and the preceding clause provided only for recording settlements, which should be executed after the passage of the act. That the Court could not, from the obscurity of the wording, ascertain whether the legislature intended to extend the provision or sanction of the third clause, to both the preceding clauses, or merely to 'the next antecedent; and that the Court could not add words to give the law a different effect from that which it admitted on its face, nor to make that clear and perfect which wasl doubtful and imperfect — especially as pe-mil laws are to be construed strictly, and the penalty •here would operate as a penal statute. Therefore the Court supported the settlement, though not recorded as 'the law directed.
With the highest deference for the authority of the learned judges who decided this case, I have not been able to satisfy my mind with this decision, after the matures!; consideration. Doubtless the act was very ob- *235 seurely worded, but still I think the intention of the legislature was clear, and that intention was sufficiently though darkly expressed. It could not be presumed that the legislature meant to enact a nullity 5 to direct an act to be done, to wit, the- recording settlements made before the act was passed, without some quence resulting from a disobedience to its direction. Yet that was the effect of the decision. Nor can I perceive that it was requisite to supply words, to give effect to the meaning of the legislature. For admitting there was a doubt whether the words, « such deed or settlement” could be extended beyond the immediate antecedent, (which was the pro.vision relative to future settlements) that doubt I think was solved by the subsequent words. For the third clause goes on to say, that if such-marriage deed, &c. should not be recorded in the manner, and within the times beforementioned, then the same in respect to creditors shall be deemed fraudulent, ■&c. Now the use of the woi*d “ times” shews, I think,, clearly, that the legislature meant to extend this third clause to both the antecedent clauses. If it had been intended to limit its extent to the last antecedent, it would have said « time for the last antecedent clause relative to settlements, to be thereafter made, has but one provision of time. It fixes .three months after the execution for recording. The first clause gave a different and a longer time for recording settlements in existence. at the time of the passing- of the act. «Times,” therefore, was the word proper to be used in the 3d- clause,, if it was intended to refer to both the preceding clauses.. « Times” is the word used. Í should therefore have concluded that the penalty for not recording, provided by the Sd clause, extends to the different settlements spoken of in the 1st and 2d clauses. And when I recollect tlie rule in the construction of statutes, that if it can be prevented, no clause, sentence or word shall be superfluous, void or insignificant, I confess I should not have been willing to give this statute such a construction as completely defeated, and made of no effect, its 1st *236 clause. Notwithstanding this opinion, Í should still be unwilling to shake a decided case, upon which much property is held. And, fortunately, no necessity exists to do so, in order to attain iustice in the case under con. sideration ; for it stands clear of the first clause altoge-That provides for the case of settlements existing at the time of the enactment of the law, which was on the 8th of March, 1785. The settlement now under consideration bears date the 28th December, 1785. It comes therefore under the 2d clause of the statute of 8th March, 1785, which directed that all marriage settlements, executed after the passage of the law, should he recorded within three months after the execution. And the third clause, declaring that if such settlements "were not recorded within the time prescribed, they should be deemed fraudulent, and the estate liable to the payment of debts, has a direct and incontrovertible application to the settlement now under discussion.
This being my opinion, it might be sufficient to stop here. But as the able counsel for the defendant thought that this case was strengthened by the view he took of the act of the 21st Deeember, 1792, amendatory of the act of the 8th March, 1785, I will examine that point.
The law of December, 1792, after reciting that settlements, made prior to the 8th March, 1785, had been judicially determined not to be within the operation of the sanction or penal part of that law, enacts that such settlements shall be recorded within a time newly pre-sci’ibed $ and, for default thereof, declares such deeds to be fraudulent, and null and void with respect to creditors and purchasers and mortgagees. This is a clear and perspicuous provision; but it has no relation to the settlement under consideration ; which is one made after the passage of the act of 8th March, 1785, and comes clearly, as I have shewn, within the provisions of the second and third clauses of the act of 8th March, 1785, The next and only remaining clause of the act of 1792, has no relation to any settlements in existence before the 1st June, 1793, consequently can have no bearing on *237 the question before the Court. The case of Wilson and Wilson, decided in September, 1794, is supposed to be in collision with the decision in Lenox and wife, decided in 1792. Bat it is due to the judges, who decided those causes, to shew that there is no inconsistency between them. The settlement in Wilson and Wilson was after the act of 8th March, 1785, and before the act of 21st December, 1792. The Court took a view of both the acts, and shewed clearly that the act of 1792 has no sort of relation to such cases ; for its first clause barely amends the supposed defect of the first clause of the act of 1785, with respect to settlements made prior to 17851 and the second clause is entirely prospective, and leaves all settlements made after the 8th March, 1785, and before the 21st December, 1792, to the operation of the second and third clauses of the act of 1785, which alone related to them. The Court then pronounced that the settlement in Wilson’s case, being made after the act of 1785 and before the act of 1792, is within the 2d and 3d clauses of the act of 1785, and not being recorded, according to its provisions, is void. This is precisely the judgment which I am bound to give in the case under consideration.
The settlement was made after the 8th March, 1785, and before the act of 1792. It is included in the 2d and 3d clauses of the act of 1785, and not being recorded according to the provisions of that act, is void — and the act of 1792 has nothing to do with it.
I have been thus particular in the examination of these acts, (perhaps unnecessarily so) because much doubt and perplexity was supposed to hang over them. There never, in my opinion, was but one reasonable doubt; and that was as to settlements made before the passage of the act of March, 1785; and that doubt has no relation to this settlement, which was made after that act.
It was said that this case was not within the reason of the act. But it surely is within the general reason of the law, though not perhaps within the reasoning of the *238 Pream^e °f the 2d act. And it is most' clearly within the provisions of the law.
It was farther contended, that even if the settlement s^011^ considered void, still an obligation would remain, and the wife would stand asa creditor, and the Court would hold the property to satisfy her. The Court would gladly do any thing in its power to protect that portion of the property which was really and bona fide the wife’s. But how can it be done 2 The marital rights of the husband attached on the marriage, and the property reduced to possession became his absolutely, and liable to his debts, unless the settlement interposed. That deed being pronounced under the law to be fraudulent and void, the Court cannot take away nor diminish the rights of the creditors. The wife and her representatives have no bond, nothing to stand upon, but a deed, which is void. There are cases, to be sure, where, though the bond or contract, or deed, be made void by the operation of some law, an obligation has been decided to be still subsisting, and the Court enforced it. But they are different cases from these; and they are decided as between the parties themselves, and not to the prejudice of other persons, in relation to whom Such deeds have been declared void by law.
It was further contended by the able and indefatigable counsel for the defendant, that the statute of limitations runs against frauds from the time of the discovery ; and that Mr. Harvey had given strong and distinct intimations of the fraud to Mr. Greenwood and Mr. Croft, two of the creditors. Since which the creditors had slept/ on their rights ; and meanwhile the statute had run against them, and in favor of the possessor of the negroes — especially as the children take as purchasers.
Authorities were cited to prove that the statute of limitations would run, in cases of fraud, after the discovery; even against mortgagees and judgment creditors.
Let us examine them. 3 P. Wms. 143, 144. So. Sea Com. vs. Wymondsel, was chiefly relied on; and undoubtedly the Lord Chancellor, in that case, was of *239 opinion that the complainant ought to charge in his bill, that the fraud was discovered within six years before exhibiting the bill. But it appears by that case, and another cited therein, that the Coui’t even after the sta- , _ ' tute would permit the complainant to amend the bill by charging that he did discover the fraud within six years before exhibiting his bill.
So here, if I deemed it necessary 1 should permit the complainant to amend his bill by making that charge. I do not, however, think that this formality is necessary. For even admitting the law to be as stated, that the statute runs in cases of frauds from the time of the discovery, (which however is to be taken with considerable restrictions and qualifications,) yet the facts in this case do not shew that the discovery was made six years before the bill was filed. Mr. Harvey swore, that when questioned by two of the creditors he gave them intimations of the state of the case, and hinted that property could be made forth-coming. But he did not make that clear and full disclosure of the facts, which could enable the creditors to see the nature and extent of the frauds committed. Nor could he — for Harvey himself did not know the whole of the fraudulent transaction's. This, then, is not that full and complete discovery of the frauds which would enable the possessors of the property under the fraud ulent deeds to shelter themselves under the protection of the statute.
And if the statute could be supposed to run against the two creditors, to whom some intimations were given by Mr. Harvey of the fictitious deeds, .in which he had been made a party, this would not extend to the other creditors nor to any other property than that conveyed to Harvey.
Having considered all the important points made in this cause, I come now to decree what appears to me the result of the reasonings used, and the justice of the case.
It is therefore ordered and decreed, that all the deeds, bills of sale and. conveyances, in question, except the bill *240 Sa*e ^rom Stephen Townsend to Clement Brown, an executor of George Arthur, for seven negroes, dated 22d February, 1792, be, and the same are hereby ^ec^are^ to be null and void, and shall be cancelled. And the real and personal estate comprised in said deeds an(j y¡]s ()f sajej s¡ia]} {je and remainsubject to the claims of the creditors of the said Stephen Townsend, according to their legal lights. And it is further ordered and decreed, that the deed of settlement, executed by Stephen Townsend on the 28th December, 1785, be, and the same is hereby declared to be null and void, with respect to the creditors of the said Stephen Townsend. And that the estates, real and personal, comprehended therein, shall be and remain subject to the demands of his creditors.
It is further ordered and decreed, that the judgment at law, obtained by Clement Brown, an executor of Geo. Arthur:, against Stephen Townsend, under very doubtful circumstances, be, and the same is hereby declared' to be satisfied, the said Clement Brown, the executor, having acknowledged by letter to the attorney, on record, that the same had been satisfied.
It is further ordered and decreed, that the bill of sale of negx*oes, made by Stephen Townsend to Clement Brown, as executor of George Arthur, he held as a security for the payment of such debt as may be justly and bona fide due by the estate of Stephen Townsend to the estate of George Arthur : and that it be referred to the master to examine the accounts and demands subsisting between those estates, and to report forthwith.
With respect to the income, or rents and profits, derived from the lands and negroes comprehended within the said deeds and bills of sale, and which have come to the possession of the defendant, George Arthur — .as it is clear that he was entirely ignorant, and is entirely innocent, of all the frauds committed in this case : as the property came into his hands under a legal title, apparently fair and valid; as he represented minors, whose Interests he was bound to defend j and as Im has expend *241 ed a considerable part of tbe income for the benefit of the minors, who have no estate distinct from the property in question, out of which he could he reimbursed ; and as the creditors have not investigated these transactions, and pursued their rights with the diligence which they might have done — It is ordered and decreed, that he shall be allowed, in his account of the receipts of rents and profits of said real and personal estates, all just and reasonable charges for expenditures by him made, for and on behalf of the education, support and maintenance of the said minor children of Stephen Townsend,- or for and on account of the protection, improvement or safe-keeping of said property ; with his commissions on such receipts and expenditures.
Messrs. Geddes, Ceoet, Cheves, and W. L. Smith, solicitors for complainants.
Messrs. K. L. Simons and Bee, for defendants.
There was no notice of any appeal in this case.

 The objection made to the competency of Mr. Harvey, as a witness, was confined to the point argued above. It was nor insisted upon, that his character of trustee prevented his being a witness to destroy the deed of which he was the trustee. That point had, however, been made *225 in the case of Mrs. Winifred Wilson, by her prochein amie, vs. John. Wilson, her husband, which was decided in July, 1791. The husband in that case examined the trustees, to prove that the deed was not made bona fide as a marriage settlement, nor at the time it bore date, before the marriage, but at a subsequent time after the marriage, and merely to elude a forfeiture, But the Court, after great argument, refused to admit the evidence of the trustees, on the ground that trustees are created to support the objects of trust deeds, and shall not be permitted to give evidence to destroy them. See tire case reported in the 1st volume of these reports, pages 219, 230,232.
The want of printed reports, and the difficulty of always getting readily at manuscript decrees, perhaps prevented the counsel 'in the case under consideration from citing and relying on that decree. But that case, whatever weight is given to the decree, is distinguishable from the present. The trustees were really the friends of the husband, actors, and voluntary parties in the transaction and execution of the deeds. And the deeds or bonds expressed the trusts and the uses which they professed to be intended for. The conveyance to Mr. Harvey was of 13 negroes absolutely, and for an alleged valuable consideration, vfrthout the smallest expression or intimation of a trust. No possession was ever given ofthese negroes to Mr. Harvey; but he afterwards (in about seven weeks) conveyed six of the thirteen negroes to Mr. Hibben, in truát for Townsend’s children.
Harvey proved that he never paid a cent for the negroes, nor ever had possession; nor was the deed recorded — and Mr. Hibben (to whom the objection, as a trustee swearing to destroy his trust deed, was more applicable) swore he never had possession: and both Harvey and Hibben swear they believe a': -¡these deeds were made to cover the property from creditors. Harvey, under these circumstances, cannot be considered, a trustee, destroying his deed of trust.